EICKSTEDT and wife, Appellants, vs. SEIFERT and another, Respondents.

*April 5—May 1, 1956.*

For the appellants there was a brief by *Frank, Karl & Bessman* of Milwaukee, and oral argument by *Leonard Bessman.*

For the respondents there was a brief by *Gerold & Huiras* of Port Washington, for Adolph Seifert, and by *James J. Koenen,* district attorney of Ozaukee county, and oral argument by *Mr. Ralph J. Huiras* and *Mr. Koenen.*

CURRIE, J.   We have here a situation where the defendant Seifert accumulated waters in an artificial pond or reservoir on his premises and then with the assistance of his codefendant diverted said waters from said pond in such close proximity to plaintiffs' lands that the same were damaged by means of the percolation of said diverted waters. Such act of diversion was performed by defendants after being duly warned by plaintiffs that the lands of the latter were likely to be damaged by such diversion.

In the case of *Pettigrew v. Evansville* (1870), 25 Wis. 223, the plaintiffs sought an injunction and alleged that the street commissioner of the defendant village was digging a ditch for the purpose of draining a large body of standing water from one of the village streets, endangering the plaintiff's land. The court found a plain distinction between the mere turning away of surface water and the collection of it in a pond and the removal of it in such a manner that it was likely to be cast upon the plaintiff's land through a ditch or other artificial channel. The court made the distinction with greater emphasis upon rehearing (p. 237):

"This principle is well established by all the cases; and because the proprietor is not responsible for injuries caused by obstructing or turning away from his own land surface water flowing thereon from the lands of others, counsel argue that he may, by ditches, drains, or other like means, carry off the surface water falling and accumulating on his own land, and discharge it upon the land of another, doing never [sic] so much damage, and that no liability or obligation to compensate for the injury arises at all. The distinction between the two cases, and the corresponding difference in principle, is to our minds very clear and palpable, and an examination of the authorities will show, at least so far as they have been cited or as we have been able to find them, that the proposition contended for by the counsel is not sustained by any one of them. And it would be strange if any authority could be found to support it. *The proposition that an owner of land may, with impunity, drain off the ponds and stagnant waters therefrom upon the land of another, destroying its value, is so iniquitous and unjust as to be abhorrent to the sense of justice of every intelligent mind. No court could sustain it; or, if any one could, we cannot.*" (Emphasis supplied.)

The *Pettigrew Case* was cited by this court with approval as recently as 1954, in the case of *Watters v. National Drive-In, Inc.,* 266 Wis. 432, 436, 63 N. W. (2d) 708, but the facts in the latter case were distinguished from those in the *Pettigrew Case* on the ground that the waters diverted were surface waters and not waters which had been accumulated in a pond or reservoir.

The defendants advance the following two grounds for denying liability in the instant case: (1) The damage to plaintiffs' lands did not result from any direct overflowing of the surface, but only as a result of the diverted waters from the pond reaching said lands through percolation; and (2) the pond was drained directly into a drainage ditch located within the boundaries of the public highway, which ditch constituted a natural watercourse.

The case of *Schuster v. Albrecht* (1898), 98 Wis. 241, 73 N. W. 990, is controlling on the first of said two contentions advanced by defendants. In that case the plaintiff and defendant owned adjoining farms with a natural depression existing at the boundary line. There was another depression located on defendant's premises about one-fourth mile from such common boundary line in which surface waters accumulated to form a pond. This pond varied from two to fifteen acres in extent, had no natural outlet, and had existed for many years without drainage. The defendant conceived the idea of reclaiming the soil under such pond by draining the same by means of a six-inch tile drain some 1,400 feet in length and emptying at a point about 250 feet removed from plaintiff's land; while along the line of the drain defendant proposed to construct three wells 20 to 25 feet in depth to collect water which would escape between the joints of the' tile. At a time when 1,100 feet of the tile drain had been constructed and two of the wells dug, plaintiff instituted an action to enjoin the continuation of the drain to the proposed terminus on the ground that the slope of the land and the nature of the soil was such that the water would percolate through the plaintiff's lands to their injury. The trial court granted a permanent injunction and on appeal such judgment was affirmed. In its opinion the court stated (p. 245) :

"In the present case the owner of the pond did not propose to discharge the water directly upon his neighbor's land, but proposed to conduct it, by an artificial channel, *to a point on his own land in close proximity to the line, where it would inevitably permeate the surrounding soil and percolate through the same into his neighbor's land, and permanently injure the same.* We perceive no logical difference between the quality of the two acts. In either case there is a permanent injury to his neighbor's land, caused by water conducted thereto by an artificial channel; and the injury caused by percolation artificially caused may easily be as

great, or greater, than the injury caused by direct discharge in a stream. Gould, Waters, par. 271." (Emphasis supplied.)

In footnote 14, appearing at page 523 of the annotation entitled, "Liability for overflow or escape of water from reservoir, ditch, or artificial pond," 169 A. L. R. 517, the author of the annotation states:

". . . seepage cases have been included, since the distinction between surface and underground passage is only material as a circumstance of negligence."

Under the facts of the instant case, we deem it to be entirely immaterial whether the damage to plaintiffs' lands from the diversion of the waters of the gravel-pit pond resulted by reason of such waters directly overflowing the surface of such lands, or reaching the same through percolation.

Defendants' brief cites several cases in support of the contention made that the drainage of the water out of the gravel-pit pond into the highway ditch relieved defendants of any liability for damage resulting from the route pursued by such waters after reaching such natural watercourse. However, none of such cases are in point because they are all concerned with the diversion of surface waters and not waters which had been accumulated in an artificial pond or reservoir.

In the instant case the defendants were warned that the water so diverted from the pond into the highway ditch was likely to reach plaintiffs' land, and yet defendants, in spite of such warning, which proved to be accurate, did drain the gravel-pit pond into this ditch which was inadequate to carry off such water in such manner as to prevent it percolating under the highway into plaintiffs' lands. The fact that the waters were drained from the pond into the highway ditch is only significant on the issue of defendants' negligence. A per-

son is negligent "when he does an act or omits a precaution when from the circumstances he ought reasonably to foresee as an ordinarily intelligent and prudent person that such act or omission may probably cause injury to another." *Hamus v. Weber* (1929), 199 Wis. 320, 324, 226 N. W. 392; and *Sturm v. Simpson's Garment Co.* (1956), 271 Wis. 587, 594, 74 N. W. (2d) 137. We cannot hold as a matter of law that draining the waters of the gravel-pit pond into this highway ditch did not constitute negligence on the part of the defendants. On the contrary, whether the defendants were negligent in so doing presents an issue of fact for the jury to determine.

It is our conclusion that plaintiffs' amended complaint states a good cause of action against the defendants and it was error not to have overruled defendants' demurrers.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter an order overruling the demurrers to the amended complaint.